# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* P T L Cotton, Minor.

UNPUBLISHED
June 30, 2016

No. 329417
Wayne Circuit Court
Family Division
LC No. 14-516909-NA

---

Before: METER, P.J., and SHAPIRO and O'BRIEN, JJ.

PER CURIAM.

Respondent appeals as of right the trial court order terminating her parental rights to her minor child, PC, pursuant to MCL 712A.19b(3)(c)(*i*) (failure to rectify conditions leading to adjudication) and (g) (failure to provide proper care and custody). We affirm.

In June 2014, petitioner filed a petition seeking jurisdiction over PC. The petition alleged that respondent had left PC with two non-parent adults and that, while in their care, PC sustained several injuries including a laceration to his forehead, bruises on his head, healed lesions on his arms, and second-degree burns on his head and in his genital area. PC was removed from respondent's care on June 12, 2014. On June 23, 2014, respondent pleaded to jurisdiction.

Respondent was referred to numerous services aimed at reunification. Rasha Bradford, a foster care case manager, testified that the barriers to reunification were parenting skills, housing, and lack of legal income. She added that respondent's parenting skills were the biggest issue, which was why multiple services were offered to address it.

Bradford testified that respondent was referred to the parent partner program. She explained that the purpose of the program was to assist respondent in completing the parent/agency treatment plan (PATP). Bradford testified that the program was designed to help parents by giving them information and tools needed to complete the PATP so that the parents could move toward reunification. She added that it was supposed to help respondent maneuver through the system by helping her: (1) find a job, (2) obtain suitable housing, (3) earn a high school diploma or a GED, (4) obtain pre-natal services after it was apparent respondent was expecting another child, and (5) provide financial literacy classes. Bradford believed the service would have benefited respondent if she had participated in it. However, she testified that the program did not work because respondent refused to participate; in May 2015 the service was terminated based on that refusal.

Bradford also testified that respondent was first referred to parenting classes in September 2014. She was later re-referred for parenting classes, which she eventually completed in February 2015. Respondent received a psychological evaluation on February 26, 2015. Bradford testified that as a result of the evaluation, respondent was re-referred to parenting classes, was referred to a psychiatric evaluation, continued supervised visitation, and was referred to therapy. She explained that the psychological evaluation basically stated that respondent had no parenting skills.[1]

Bradford testified that respondent was initially provided parenting time two times per week for three hours each visit. She testified, however, that respondent requested her parenting visits to be decreased, so they were reduced to once per week. Bradford testified that respondent missed numerous visits and that she was consistently late to the visits she did attend. Morgan Barr, a foster care worker, testified that respondent was offered 86 parenting time visits and missed 37. She also testified that after the termination petition was filed, respondent was offered 8 or 9 additional visits and missed one. Bradford opined that the missed visits affected PC. Barr explained that the foster parents reported behavior problems after visits, including a regression in potty training. Barr also reported that on one occasion respondent told PC that the bogey man was going to get him, PC told his foster parents, and then later he woke up screaming from a nightmare.

Bradford testified that infant mental health services were also provided to respondent. She explained that the infant mental health services were to take place during parenting time to help with bonding. She testified that respondent was not consistently participating in infant mental health services because she did not consistently come to parenting visits where the services were offered.

Nastassja Cuellar-Wilson, an infant mental health therapist, testified that she began offering services in September 2014, but that she initially had difficulty contacting respondent. Cuellar-Wilson testified that PC presented as two different children when she observed him during parenting time visits and when she observed him in his foster placement. She explained that at the foster home PC was compliant, asked for help, rarely said 'no,' interacted with his foster family, touched a lot, and asked for his foster family's attention. She observed a secure bond between PC and his foster parents. In contrast, she testified that at parenting time there was a lot of tension and struggle between PC and respondent. She testified that PC was defiant, repeatedly said no, and pulled away from respondent, who used her cell phone to get his

---

[1] In particular, the psychological evaluation stated that respondent "was not able to verbalize adequate parenting skills" and that it was "uncertain whether she has insight in her role pertaining to her son's removal from the home." The report noted that it was "imperative that therapeutic intervention" occur before reunification, and it recommended individual therapy to address emotional turmoil relating to current legal circumstances, a psychiatric evaluation to determine the appropriateness of psychotropic medication, supervised parenting time to help foster a bond between respondent and PC, and parenting education classes to help her understanding of age-appropriate parenting.

attention and to get him to comply with her directives. Cuellar-Wilson opined that although PC called respondent "mom" and there were "moments of hope" during the visits, that there was no "secure bond" between respondent and PC. She added that respondent's interactions with PC were conflicting and that PC learned defensive mechanisms, such as humor, to deflect hard emotions. Cuellar-Wilson also testified that she had observed PC hit respondent and attempt to bite her.[2] She testified that she was worried about those negative behaviors showing up in the foster home. Cuellar-Wilson added that PC appears to have a high stress or traumatic response to the parenting time visits. Cuellar-Wilson explained that if a parent obtained what they needed from the parenting classes, then it would show up in the parent's interactions with the child. She testified that she had not seen any marked improvement in respondent's parenting.

Additionally, based on observed interactions between respondent and PC during parenting time visits, Bradford also opined that respondent had not benefited from the parenting classes. Bradford testified that for the majority of visits, PC would cry for his foster parents and act like he did not want to be at the visits. She said that respondent would sometimes calm PC with her cell phone. Bradford added that respondent frequently used her cell phone and that there were times when respondent was not on the phone where PC would not want to play with her. Bradford also testified that PC would hit, bite, and scratch respondent. Further, she also testified that, on a few occasions, if PC did not want to hug respondent, respondent would tell him that she was going to get food for herself, but not for PC. Bradford testified that she never observed a bond between PC and respondent.[3]

Barr observed the majority of the visits that occurred after the termination petition was filed. She testified that PC did not want to go and was very clingy to his foster mother, that respondent would use her cell phone to get him to come in to visit, and that during the visits, respondent did not use a lot of parenting skills. Barr said that they would play next to each other, argue back and forth, and that respondent once grabbed PC's arm and he said that it hurt. Overall, Barr did not see any indication that respondent benefited from the parenting classes.

Bradford testified that although the Department of Health and Human Services (DHHS) had discretion to provide unsupervised or overnight visits, no such visits were authorized because respondent had not shown that she could parent PC or that PC and she had a secure attachment. Barr added that there were no unsupervised visitations because respondent did not show proper discipline and because of respondent's lack of engagement. She testified that respondent's discipline techniques are inappropriate, noting that there was arguing and that respondent would pull on PC's arm even after he told her that it hurt.

---

[2] Cuellar-Wilson testified that the hitting and biting speak to PC's perception of security in the relationship.

[3] Bradford did testify that respondent's parenting improved when Bradford or a supported visitation person was in the room, but she testified that it was not a significant improvement and that it was not consistent. She added that basically every visit had to be regulated.

In contrast, respondent's mother testified that she observed some of the visits. She testified that PC was missing respondent as a parent and that respondent gave him a lot of attention. She testified that PC would ask to go home with her and respondent. She also testified that PC was just play biting and that respondent would grab him like anyone else would after the biting. Respondent's mother further testified that respondent is a better parent now because she takes parenting more serious. She believes that respondent would now be an overprotective parent because she learned her lesson. She also testified that PC and respondent have a bond.

Bradford testified that respondent was twice referred for individual therapy. Barr explained that respondent was initially referred in September 2014, but the services were terminated for lack of attendance in January 2015. Respondent was re-referred in March 2015 and the services continued through to the date of the termination hearing. Barr testified that respondent was "not near completion" and her therapist reported only minimal progress. Further, Bradford testified that respondent's therapist reported that respondent needed at least a year of therapy to benefit.

With regard to income, Barr testified that respondent provided proof of employment on two occasions, but she currently had no legal income source.

With regard to respondent's housing situation, Bradford testified that respondent was provided services to help her housing situation. Barr testified that respondent provided a new signed lease agreement the week before the termination hearing. She indicated that she was told it was a two bedroom apartment, but said that she had not investigated it yet. She testified that respondent reported that the apartment had a roach problem, which made the housing inappropriate.

Finally, Bradford expressed concern about respondent's judgment. She testified that during the case, respondent met a man who also had a pending child protective services (CPS) case for failure to protect. She testified that respondent entered into a relationship with that man, who, according a report by respondent, hit her and chased her down a street with a dog after she became pregnant. Bradford testified that respondent's decision to enter a relationship with the man showed that she was unable to make "safe decisions for herself or for her child." Bradford testified that respondent denied being in a relationship with the man, stating that they were just friends before she disclosed that she was pregnant with his child.

Following a termination hearing, the trial court found that grounds for termination were established under MCL 712A.19b(3)(c)(*i*) and (g). The court also found that termination was in PC's best interests.

On appeal, respondent argues that termination was not proper under (c)(*i*) or (g) because she was bonded with PC and was at least in partial compliance with the PATP. Respondent points out that she had completed a psychological evaluation, a psychiatric evaluation, and her parenting classes. She also points out that she visited the child for more than half of the offered parenting time visits and also attended all of the court hearings. Respondent argues those facts show that there was a very reasonable expectation that she would be able to provide care and custody within a reasonable time and that PC would not be harmed if returned to her home. We disagree.

In order to terminate parental rights, "the trial court must find that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been proved by clear and convincing evidence." *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011).[4] The trial court in this case found grounds for termination under MCL 712A.19b(3)(c)(*i*) and (g), which provide:

> (3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:
>
> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.
>
> * * *
>
> (g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

The biggest challenge to reunification was respondent's parenting skills. Although respondent completed services aimed at rectifying this condition, she nevertheless missed a significant number of parenting visits, failed to participate in services aimed at helping develop a bond, and was consistently late to the parenting time visits she did attend. She was unable to demonstrate age appropriate parenting skills, was frequently on her phone, and was unable to adequately discipline PC. None of the caseworkers who testified were able to see any improvement in respondent's parenting as a result of the completed parenting classes. Thus, despite being offered numerous services to address her parenting skills, respondent was unable to show an improvement to her parenting after over a year of services. Although respondent points out that she participated in and actually completed some services, a parent's mere participation in and benefit from services is insufficient; rather, a parent must demonstrate sufficient compliance with and benefit from services to address the problem targeted by those services. *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). Further, respondent was unable to obtain suitable

---

[4] This Court reviews for clear error a trial court's finding of whether a statutory ground for termination has been proven by clear and convincing evidence. MCR 3.977(K); *In re BZ*, 264 Mich App 286, 296; 690 NW2d 505 (2004). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *Id*. at 296-297.

housing during the pendency of the proceedings. Although, she had secured a two-bedroom apartment shortly before the termination hearing, the record reflects that it was inappropriate because it had a roach problem. Respondent was also unable to maintain a stable income source. At the time of the termination hearing, PC was two years old and had been in foster care for almost half his life. Given respondent's failure to comply with and benefit from services aimed at reunification during the pendency of the proceedings, the trial court did not clearly err in finding that termination was proper under MCL 712A.19b(3)(c)(*i*) and (g).

Although respondent does not directly challenge the trial court's finding that termination was in the child's best interest, we conclude that the court's finding was supported by a preponderance of the evidence. "In deciding whether termination is in the child's best interests, the court may consider the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts Minors*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012) (internal citations omitted).

The record reflects that PC had been in care for half his life. Respondent was provided with numerous services, including multiple referrals for parenting classes and individual therapy. She was terminated from the parent partner program for lack of attendance. She failed to attend a significant number of parenting visits. Over a year after the case started, she still had no appropriate housing and no legal income. Further, respondent displayed poor judgment when she became involved in a relationship with a man who had an open CPS case. After becoming pregnant with that man's child, she was subjected to domestic abuse when he hit her and chased her down the street while she was pregnant. The record also reflected that respondent lacked a secure bond with PC despite being provided with services specifically aimed at improving her bond. Cuellar-Wilson testified that PC was anxious at parenting-time visits, would bite and hit, and had resorted to humor to deflect hard feelings. She testified that he presented completely different with his foster parents, with whom he displayed a secure bond. She added that he was thriving in that placement. Given the record in this case, the trial court did not clearly err in finding that termination of respondent's parental rights was in PC's best interests.

Affirmed.

/s/ Patrick M. Meter
/s/ Douglas B. Shapiro
/s/ Colleen A. O'Brien